**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0948-19

JENNIFER DENNIS,

     Plaintiff-Appellant,

v.

ST. PETER'S UNIVERSITY
HOSPITAL,

     Defendant,

and

DR. CANDIDO DEBORJA,

     Defendant-Respondent.

_____

Argued December 8, 2020 – Decided April 26, 2021

Before Judges Yannotti, Haas and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-2505-17.

Caesar D. Brazza argued the cause for appellant (Brazza Law, LLC, attorneys; Caesar D. Brazza, on the briefs).

Jessica J. Mahony argued the cause for respondent (Ruprecht Hart Ricciardulli & Sherman, LLP, attorneys; Renee J. Sherman, of counsel and on the brief; Jessica J. Mahony, on the brief).

PER CURIAM

Plaintiff Jennifer Dennis appeals from a unanimous no cause verdict on her medical malpractice complaint and the court's decision to deny her motion for a new trial. She primarily contends the court committed error in failing to charge the jury regarding the informed consent doctrine, and by providing the jury with an incomplete and misleading verdict sheet. For the following reasons, we vacate the verdict and remand for a new trial.

I.

We distill the relevant facts from the trial court proceedings. In August 2005, after experiencing abdominal pain, plaintiff visited defendant Candido Deborja, M.D., who recommended and performed a surgical procedure known as a cholecystectomy to remove her gallbladder. Prior to the surgery, plaintiff signed a consent form confirming that Dr. Deborja "explained the risks, benefits, and, alternatives of the treatment," and that he informed her regarding the potential need to convert the surgery, initially planned to be performed with a laparoscope, to an open procedure. After the surgery, plaintiff had a post-

A-0948-19

operative meeting with defendant where he informed her that the surgery proved difficult and he needed to "open [her] up [to] complete" the operation.

Plaintiff had no serious abdominal issues following the surgery until after the birth of her son, approximately six years later, in September 2011. She testified that she experienced shortness of breath, sweating, and pain in the upper abdomen and stated that she thought it had something to do with her recent cesarean section. She visited St. Peter's University Hospital (St. Peter's) and after various imaging scans, was informed she was fine and discharged. Plaintiff, however, continued to experience more frequent pain over the course of the ensuing years, which she described as feeling as if her "insides were on fire."

After undergoing additional testing which failed to discover the source of her pain, plaintiff visited the emergency room in September 2016 and was told that it was "likely that [her] gallbladder was still there." Further diagnostic evaluations noted several stones in her bile duct. As a result, plaintiff underwent a second surgery to remove what was described as a "remnant gallbladder," which was performed by a different surgeon. After the second surgery, plaintiff's abdominal pain ceased.

A-0948-19

Plaintiff filed a complaint in the Law Division claiming that defendant and St. Peter's committed medical malpractice.[1] Specifically, plaintiff alleged that defendants:

> negligently failed to exercise ordinary care, adequately inform the plaintiff of the complications and risks of the procedures, adequately inform the plaintiff of the results of the procedure, and otherwise failed to exercise the degree of care commonly exercised by other physicians in like cases having regard to the existing state of knowledge in general surgery.

Plaintiff testified at trial, as did her mother. Plaintiff's mother recounted her observations of plaintiff's "severe [and] excruciating" pain between the first and second surgeries.

Michael Drew, M.D., testified as plaintiff's surgical expert. He generally described the cholecystectomy procedure and its intended goal "to prevent future pain and, under the circumstances, . . . to cure [an] infection."

Dr. Drew further described plaintiff's procedure as a partial cholecystectomy, in which the surgeon removes only a portion of the gallbladder. He stated that in such circumstances, after the surgery, "the duty of the surgeon is to notify the patient . . . and the doctors taking care of the patient" of the remnant gallbladder because the remaining gallbladder may

---

[1] St. Peter's was dismissed prior to trial.

A-0948-19

become diseased again and "the patient has to know that, if they get pain, fever, . . . they still have, for all intents and purposes, a gallbladder in place." He further explained that "after the operation, . . . it's incumbent upon the surgeon to explain to the patient what was done" and that there was a duty to determine whether there was a gallbladder remnant "because one of the . . . side effects of . . . leaving a piece of the gallbladder i[n] is that [the] patient can get cholecystitis, inflammation of the gallbladder, again."

Dr. Drew noted that plaintiff's gallbladder was not completely removed because "[defendant's post-operative notes stated] he . . . triply ligated the gallbladder. So, that tells you that he's dealing with a portion of the gallbladder above the cystic duct." In his opinion, defendant removed only eighty percent of plaintiff's gallbladder.

Dr. Drew also testified that plaintiff's abdominal pain was caused by inflammation of the remnant gallbladder as well as the development of "stones in the remnant [gallbladder], and in the cystic duct, which then moved into the common bile duct."

Notably, Dr. Drew testified that although he believed defendant properly performed the procedure, "the deviation in this case" was defendant "should have told [plaintiff,] . . . it should have been part of his operative note, and he

5

should have told the referring doctor that this patient has a piece of the gallbladder" remaining because "it makes a bearing as to how you're going to evaluate [plaintiff] . . . if she has pain, in the future." Dr. Drew further explained that failing to recognize a remnant gallbladder was a deviation from the standard of care.

Defendant testified that prior to the surgery, he discussed the risks typically associated with a cholecystectomy such as "infection, bleeding, injury to the ducts, heart and lung problems postoperatively." On cross-examination, however, he conceded that he did not discuss "the risk of leaving a part of the gallbladder inside."

Defendant stated that during the surgery, he "was able to separate the gallbladder . . . up to the level of that area of the cystic duct," indicating that he removed the entire gallbladder, but that he may have left "just a little bit there." Defendant explained he "was not worried about that little portion" and admitted, in contrast to his deposition testimony, that he did not remember whether he informed plaintiff after completing the surgery that a portion of her gallbladder remained.[2]

---

[2] In his deposition, defendant testified he did not tell plaintiff about a possible remnant gallbladder because "[he] didn't think [he] left any."

A-0948-19

Marc Mandel, M.D., testified on behalf of defendant as an expert in the area of general surgery. He concluded that defendant "kept within the standards of care and . . . actually [did] quite a good job with a difficult case." As to causation, Dr. Mandel stated there was no medical evidence suggesting that the stones which developed after the 2005 surgery were formed by the gallbladder remnant.

Dr. Mandel testified that there were numerous causes for the formation of stones unrelated to her surgery. He stated according to his review of plaintiff's post-diagnostic operative tests, her pain arose as a result of "[c]ommon bile duct stones" which did not "develop in a gallbladder remnant." Dr. Mandel also testified that the surgery performed by defendant was "[d]efinitely not" a partial cholecystectomy as Dr. Drew suggested and, based on his review of defendant's operative report, defendant "would certainly know if he left [twenty] percent [of the gallbladder] behind."

Dr. Mandel explained that a surgeon does not have a duty to discuss the details associated with ligating a gallbladder unless they "feel[] that there's a clinically significant portion of gallbladder left behind." He opined that a surgeon would only inform a patient if he left behind a portion of a gallbladder if it contained stones, was inflamed, or was still functional. In sum, Dr. Mandel

7

A-0948-19

concluded that defendant acted "in accordance with accepted standards of medical care in his intraoperative and postoperative treatment of the plaintiff."

Adam B. Elfant, M.D. also testified on behalf of defendant as an expert in gastroenterology. He concurred with Dr. Mandel's opinion that plaintiff's pain between 2011 and 2016 was related to common bile duct stones and that any gallbladder remnant "would [not] be responsible for this degree of pain." He explained the development process of gallbladder stones and noted that in plaintiff's post-operative tests the only location in which stones were present was in plaintiff's common bile duct. He stated that "with there being zero stones in the gallbladder . . . I don't see how one would postulate that these stones started in the gallbladder remnant, grew up, . . . and then passed down to the bile duct."

At the close of defendant's case, plaintiff sought a directed verdict on liability which the court denied. Plaintiff also requested the judge provide the jury an informed consent charge and asked that the jury verdict sheet contain an informed consent question.

In support of her position, plaintiff maintained that there were two deviations in the case. The first was defendant's failure to appreciate that the remnant gallbladder existed, and "the second deviation [was] the failure to

A-0948-19

inform" plaintiff of that fact. After discussing with counsel the proposed informed consent charge and jury questions, the court denied plaintiff's requests.

The jury verdict sheet ultimately approved by the court contained three questions: 1) "[d]id the defendant, Dr. Candido Deborja, deviate from accepted standards of care in failing to recognize a remnant gallbladder"; 2) "[w]as the defendant's deviation as found in [q]uestion [n]umber [o]ne a proximate cause of the plaintiff's harm"; and 3) "[w]hat amount of money would fairly and reasonably compensate the plaintiff . . . for her, disability, impairment, pain, suffering and loss of enjoyment of life." As noted, the jury returned a unanimous verdict, concluding with respect to question one that defendant did not deviate from the applicable standard of care by failing to recognize a remnant gallbladder.

The court rejected plaintiff's request for an informed consent charge and also that the verdict sheet ask the jury to determine whether defendant "deviate[d] by failing to inform." It explained that plaintiff would "not [be] prejudiced" because the question of informed consent was already part of the deviation question in that "you either die on the vine, [that the jury] didn't find that he should have known [there was a remnant gallbladder]. Or, you win . . .

A-0948-19

to the extent that you move on to the proximate cause, which you still have to prove by a preponderance of the evidence."

The court's instructions on plaintiff's deviation claim were consistent with Model Jury Charges (Civil), 5.50A, "Duty and Negligence" (approved Mar. 2002).  In its charge, the court explained that "the law imposes a duty upon [a] physician to have and to use [their] degree of knowledge and skill which is normally possessed and used by the average specialist in the field."  It also made clear that the jury "must decide the applicable medical standard from the testimony of the expert witnesses you have heard in this case," that "[w]here there is a conflict in the testimony of the medical experts on the subject," it was the jury's responsibility "to resolve that conflict using the . . . guidelines in determining . . . credibility," and that the jury was "not required to accept arbitrarily the opinions offered."

The court explained that plaintiff contended defendant "deviated from the standard of care, because he did not recognize a gallbladder remnant . . . and therefore he did not tell . . . [plaintiff] it was present post operatively."  The court noted it was defendant's position that his care for the plaintiff was appropriate and "that the standard of care did not require him to have any post operative discussion with her about any remaining gallbladder."  The court

A-0948-19

further noted that defendant disputed that plaintiff's pain was related to the remnant gallbladder.

After the jury's no cause verdict, plaintiff moved for a new trial which the court denied in an October 25, 2019 order and accompanying oral decision. In her application, plaintiff again argued that the court should have provided the jury with an informed consent charge. Plaintiff further maintained that the verdict sheet was misleading as the jury could have found defendant negligent by failing to notify her about a remnant gallbladder despite answering question one in the negative. In rejecting plaintiff's application, the court stated:

> [Y]ou never really defined [the meaning of a remnant gallbladder] for the [j]ury. You didn't call the pathologist to come in, to say what the remnant gallbladder was. So a remnant in my mind, again from the lay person, is any piece of it. And yet no expert said leaving any piece of it[] was a deviation. So you needed to prove, and you didn't, that there was a significant enough portion, at least for a [j]ury to say [defendant] should have recognized it as something of significance . . . . And yet you still want to get to the second theory, and have given me no case law that says you get to the second theory of an informed consent post[-]surgery fact situation, unless you can first prove that the doctor had something to know about to inform. And . . . you wouldn't have gotten to it because you didn't get past the first question on the verdict sheet.
> . . . I don't see how anybody can hold the doctor responsible for having to inform[] of something he doesn't or shouldn't have known about. I cannot get past that. The [j]ury determined that for us. . . .

11

. . . I don't see a miscarriage of justice . . . [under Rule] 4:49-1 . . . .  So I'm going to deny your [m]otion for a new trial.

This appeal followed.  Before us, plaintiff claims that:  1) the trial court erred by failing to provide the jury with an informed consent charge; 2) Dr. Mandel's testimony confused the jury by misstating the appropriate standard of care; and 3) she is entitled to a new trial because the jury verdict sheet was misleading and confusing.

II.

In her first point, plaintiff argues an informed consent charge was necessary because the evidence produced at trial established defendant had a duty to inform plaintiff, and include in his post-operative report, the existence of a remnant gallbladder, so that she could inform her future treating physicians of her condition.  We disagree that under the facts of this case an informed consent charge was required.

The importance of correct jury instructions cannot be understated.  "A jury is entitled to an explanation of the applicable legal principles and how they are to be applied in light of the parties' contentions and the evidence produced in the case."  Prioleau v. Kentucky Fried Chicken, Inc., 223 N.J. 245, 256 (2015) (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002)).  When

12

charging the jury, a court must "set forth in clearly understandable language the law that applies to the issues in the case." Little v. Kia Motors America, Inc., 455 N.J. Super. 411, 436-37 (App. Div. 2018) (quoting Toto v. Ensuar, 196 N.J. 134, 144 (2008)); see also Estate of Kotsovska, ex rel. Kotsovska v. Liebman, 221 N.J. 568, 591-92 (2015).

A jury charge is the "road map that explains the applicable legal principles, outlines the jury's function, and spells out 'how the jury should apply the legal principles charged to the facts of the case.'" Little, 455 N.J. Super. at 437 (quoting Toto, 196 N.J. at 144). To create such a roadmap, the court should tailor the jury charge to the facts of the case. Kotsovska, 221 N.J. at 591. Although it is axiomatic that accurate and understandable jury instructions are essential to a fair trial, see Velazquez v. Portadin, 163 N.J. 677, 688 (2000), "a party is not entitled to have the jury charged in the words of his own choosing." Kaplan v. Haines, 96 N.J. Super. 242, 251 (App. Div. 1967) (citation omitted). Our jurisprudence assumes that the jury applies the law as instructed. Cohen v. Cmty. Med. Ctr., 386 N.J. Super. 387, 399 (App. Div. 2006).

When a party raises an objection at trial to a jury charge, we review their challenge to the jury charge for harmless error. Kotsovska, 221 N.J. at 592. That is, we will "reverse on the basis of [a] challenged error unless the error is

13

harmless." Ibid. (quoting Toto, 196 N.J. at 144). An error is harmful when it is "clearly capable of producing an unjust result." Ibid. (quoting R. 2:10-2). In reviewing such challenges, we "examine the charge as a whole, rather than focus on individual errors in isolation." Ibid. (quoting Toto, 196 N.J. at 141).

"[A] patient has several avenues of relief against a doctor: (1) deviation from the standard of care (medical malpractice); (2) lack of informed consent; and (3) battery." Howard v. Univ. of Med. & Dentistry of N.J., 172 N.J. 537, 545 (2002) (citing Colucci v. Oppenheim, 326 N.J. Super. 166, 180 (App. Div. 1999)). "Although each cause of action is based on different theoretical underpinnings, 'it is now clear that deviation from the standard of care and failure to obtain informed consent are simply sub-groups of a broad claim of medical negligence.'" Ibid. (quoting Teilhaber v. Greene, 320 N.J. Super. 453, 463 (App. Div. 1999)).

"[A] claim based on the doctrine of informed consent is predicated on the patient's right to self-determination." Canesi v. Wilson, 158 N.J. 490, 503-04 (1999). "Choosing among medically reasonable treatment alternatives is a shared responsibility of physicians and patients," and physicians "have a duty to evaluate the relevant information and disclose all courses of treatment that are medically reasonable under the circumstances." Matthies v. Mastromonaco, 160

N.J. 26, 34 (1999). The doctrine of informed consent obligates a doctor to disclose material risks inherent in a procedure or course of treatment so that the patient can make an informed decision. Id. at 36.

The doctrine is also based on a physician's duty to provide patients with sufficient information to enable them to "evaluate knowledgeably" the available options and their respective risks before submitting to a particular procedure or course of treatment. Perna v. Pirozzi, 92 N.J. 446, 459 (1983) (citation omitted). To prove a physician was negligent premised upon a theory of lack of informed consent, a plaintiff must show:

> (1) the physician failed to comply with the applicable standard for disclosure; (2) the undisclosed risk occurred and harmed the plaintiff; (3) a reasonable person under the circumstances would not have consented and submitted to the operation or surgical procedure had he or she been so informed; and (4) the operation or surgical procedure was a proximate cause of plaintiff's injuries.
>
> [Newmark-Shortino v. Buna, 427 N.J. Super. 285, 304 (App. Div. 2012) (quoting Teilhaber, 320 N.J. Super. at 465).]

The standard governing the required disclosure is what a reasonably prudent patient would deem material to make an informed decision about undergoing the recommended treatment. Largey v. Rothman, 110 N.J. 204, 211-12 (1988); see also Blazoski v. Cook, 346 N.J. Super. 256, 267 (App. Div.

A-0948-19

2002). This is an objective standard, relating to the patient's needs and not the physician's judgment. Blazoski, 346 N.J. Super. at 267 (citing Niemiera v. Schneider, 114 N.J. 550, 565 n.4 (1989)).

In addressing the issue of informed consent, the standard against which defendant's communication with plaintiff should be measured is not a legal issue to be defined by the court. Nor is it established by expert testimony. See Largey, 110 N.J. at 214; see also Kimmel v. Dayrit, 301 N.J. Super. 334, 352-53 (App. Div. 1997) ("[T]he duty to inform a patient of all reasonable options is a standard of care well within the understanding of a lay jury and requires no expert testimony."). Rather, "[w]henever non-disclosure of particular risk information is open to debate by reasonable-minded [people], the issue is one for the finder of facts." Largey, 110 N.J. at 213 (citation omitted). Therefore, while both parties are free to present testimony of experts deemed qualified by the trial court to testify and express an opinion, the finder of fact ultimately will be required to resolve the issue in the context of the reasonably prudent patient standard.

We discussed the distinction between a deviation and informed consent claim in Eagel v. Newman, 325 N.J. Super. 467 (1999). In that case, we found that the plaintiff's "informed consent argument . . . confuse[d] the course of the

disease with the course of the treatment." Id. at 475. We explained that "[n]ot taking the necessary and available steps to protect the patient or to permit the patient to protect himself from the potential course of the disease is negligent treatment." Id. at 475-76. In contrast, "[d]epriving the patient of the opportunity to reasonably determine for herself whether she wishes to accept the risks of a proposed or alternate treatment is an informed consent failure irrespective of whether the treatment itself is performed in accordance with prevailing medical standards." Id. at 476. To further illustrate the distinction, we stated:

> If a physician treats [a] disease by prescribing medication and bed rest but does not warn the patient of . . . complication[s] or tell the patient what its symptoms are or what to do if they appear, it may well be that the doctor will be deemed negligent in the overall treatment since proper treatment would, in our view, comprehend the giving of that advice to the patient. The physician would, however, not thereby have failed to obtain the patient's informed consent to the treatment that was administered.
>
> [Id. at 475.]

Here, an informed consent charge was not appropriate or required. Although couched similar to an informed consent claim, plaintiff's theory was ultimately grounded in defendant's alleged deviation of the standard of care. Indeed, Dr. Drew specifically testified that the "deviation in this case" was

17

defendant's failure to recognize <u>and</u> notify plaintiff of a remnant gallbladder after surgery.

Based on the trial evidence, defendant did not deprive plaintiff of the opportunity to make an informed decision regarding whether to undergo the cholecystectomy procedure and, in this regard, plaintiff made no claim that defendant failed to inform her of any material fact prior to the surgery or that she would have declined to proceed with the surgery based on defendant's pre-operative information. Instead, plaintiff's allegation related to defendant's deviation in failing to "tak[e] the necessary and available steps" to allow her to protect herself from the course of her disease. <u>Eagel</u>, 325 N.J. Super. at 475-76. In other words, plaintiff claimed defendant was negligent by failing to notify her post-operatively about potential complications as a result of the cholecystectomy.

As in <u>Eagel</u>, plaintiff confuses the course of her disease with the course of her treatment. As we previously held, such claims are grounded in deviation of the standard of care, not a failure to obtain informed consent. Accordingly, we discern no error in the trial court's decision not to charge the jury on informed consent.

We also distinguish plaintiff's reliance on Newmark-Shortino v. Buna. 427 N.J. Super. 285. In Newmark-Shortino, the plaintiff terminated her pregnancy based on a medical diagnosis given by the defendant doctor and his recommended course of treatment. 427 N.J. Super. at 292-94. Plaintiff's expert testified that defendant deviated from accepted standards of care in his diagnosis, and plaintiff asserted the defendant doctor was negligent because he did not receive plaintiff's informed consent. 427 N.J. Super. at 295-96. The trial court denied plaintiff's request for a jury charge on informed consent. Id. at 308-09. We reversed noting "the doctrine [of informed consent] applies 'irrespective of whether the treatment itself is performed in accordance with prevailing medical standards.'" Id. at 305 (quoting Eagel, 325 N.J. Super. at 476). We found Eagel distinguishable because plaintiff "raised the issue of an undisclosed treatment option available to her, a factor not present in Eagel." Id. at 308.

Unlike Newmark-Shortino, however, plaintiff here never asserted she would have declined the procedure performed by defendant had she received additional information. Nor did plaintiff suggest at trial that defendant failed to provide her with an undisclosed treatment option as an alternative to the cholecystectomy procedure. While we found the evidence presented at trial in

19

<u>Newmark-Shortino</u> the "unique" situation based both on deviation from accepted standards of care and informed consent, <u>ibid.</u>, we are satisfied that is not the circumstance here.

## III.

We also reject as unpersuasive plaintiff's argument that Dr. Mandel's testimony confused the jury. According to plaintiff, Dr. Mandel improperly testified that defendant only had a duty to disclose the remnant gallbladder if he believed it was "clinically significant," as opposed to what a reasonably prudent patient would want to know under the circumstances. Plaintiff contends Dr. Mandel's testimony and the trial court's failure to issue a curative instruction resulted in reversible error.

Plaintiff's counsel failed to object to Dr. Mandel's testimony and did not timely request a curative instruction. Failure to object to testimony is reviewed under the plain error standard. <u>Rule</u> 2:10-2 provides that we will not reverse unless the alleged plain error was "clearly capable of producing an unjust result." When counsel fails to object, it ordinarily indicates counsel's perception that no harm has been inflicted. <u>See</u> <u>Fertile v. St. Michael's Med. Ctr.</u>, 169 N.J. 481, 495 (2001). Further, the absence of an objection also has the unfortunate consequence of preventing the trial judge from remedying any possible

<u>A-0948-19</u>

confusion.  Bradford v. Kupper Assocs., 283 N.J. Super. 556, 573-74 (App. Div. 1995).

As discussed, the court properly denied plaintiff's request for an informed consent charge and instructed the jury that the appropriate standard was whether defendant deviated from accepted standards of care by failing to recognize and notify plaintiff about the remnant gallbladder.  The court's jury instructions correctly outlined the law on this issue.  Indeed, as noted, the court provided instructions on plaintiff's deviation claim consistent with Model Jury Charges (Civil), 5.50A, "Duty and Negligence" (approved Mar. 2002).  Accordingly, we conclude that Dr. Mandel's testimony was not "capable of producing an unjust result."  R. 2:10-2.

IV.

Plaintiff also claims that she is entitled to a new trial because "multiple trial erro[r]s" created a "miscarriage of justice."  Specifically, she again maintains the court erred by:  1) failing to charge the jury correctly on informed consent and the reasonably prudent patient standard, and 2) providing a misleading and confusing jury verdict sheet.  We disagree with plaintiff's first argument for the reasons we have already discussed, but agree the verdict sheet

21

inadequately addressed plaintiff's deviation claim and could have led to a "miscarriage of justice."

A trial court must grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). The standard for appellate review is also whether "a miscarriage of justice under the law" occurred. R. 2:10-1; Dolson v. Anastasia, 55 N.J. 2, 7 (1969). A miscarriage of justice exists when a "pervading sense of 'wrongness'" justifies the "undoing of a jury verdict." Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977)). An "appellate court must make its own determination as to whether there was a miscarriage of justice, deferring to the trial judge only with regard to those intangible aspects of the case not transmitted by the written record—described by the [c]ourt as witness credibility and demeanor and the 'feel of the case.'" Pressler & Verniero, Current N.J. Court Rules, cmt. 4 on R. 2:10-1 (2021).

"[J]ury verdicts should be set aside in favor of new trials only with reluctance and then only in the cases of clear injustice." Crego v. Carp, 295 N.J. Super. 565, 577 (App. Div. 1996). "The fact that the evidence may also support

a different outcome does not render the jury's verdict irrational or against the weight of the evidence." Estate of Chin ex rel. Chin v. St. Barnabas Med. Ctr., 160 N.J. 454, 468 (1999).

"The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact" by submitting "written questions which can be categorically or briefly answered." R. 4:39-1. The purposes served by jury interrogatories are "to require the jury to specifically consider the essential issues of the case, to clarify the court's charge to the jury, and to clarify the meaning of the verdict and permit error to be localized." Ponzo v. Pelle, 166 N.J. 481, 490-91 (2001) (quoting Wenner v. McEldowney & Co., 102 N.J. Super. 13, 19 (App. Div. 1968)).

The questions to the jury are to be clear. Benson v. Brown, 276 N.J. Super. 553, 565 (App. Div. 1994). "Ordinarily, 'a trial court's interrogatories to a jury are not grounds for reversal unless they were misleading, confusing, or ambiguous.'" Ponzo, 166 N.J. at 490 (quoting Sons of Thunder v. Borden, Inc., 148 N.J. 396, 418 (1997)). In reviewing the verdict sheet for reversible error, the court "should consider it in the context of the charge as a whole." Id. at 491. The Court noted in Ponzo that if the jury charge is "accurate and thorough" that

this "often can cure the potential for confusion that may be present in an interrogatory."  Ibid. (citations omitted).

Here, the court declined plaintiff's request for a jury question on whether defendant "deviate[d] by failing to inform" plaintiff about a remnant gallbladder. The court concluded that such additional language was not required because the jury would dispositively resolve this issue by its answer to question number one. We disagree with the court's reasoning for several reasons.

First, as phrased, question one framed the deviation issue in an inappropriately narrow manner.  Rather than inquiring generally if defendant's conduct deviated from the standard of care, it asked the jury to resolve only if defendant deviated in failing to recognize a remnant gallbladder.

Second, the jury's response to question number one does not conclusively resolve the factual issue if defendant failed to recognize a remnant gallbladder. The jurors could have responded no to that question by accepting Dr. Mandel's testimony that defendant did not deviate from accepted standards of care because what defendant failed to recognize was not "clinically significant."

Third, the jury was never provided the opportunity to decide whether defendant deviated from accepted standards of care by failing to notify plaintiff about the remnant gallbladder.  As noted, the question only required the jury to

A-0948-19

resolve whether "defendant . . . deviate[d] from accepted standards of care <u>in</u> <u>failing to recognize a remnant gallbladder</u>." (emphasis added).

Viewing the verdict sheet as a whole, we are satisfied that it was "misleading, confusing, or ambiguous," <u>Ponzo</u>, 166 N.J. at 490, as it could have prevented the jury from considering plaintiff's primary theory of defendant's liability that he deviated from the accepted standard of care by failing to notify her, and appropriately memorialize, that a remnant gallbladder remained. We are also satisfied that the court's instruction did not cure the defect in the verdict sheet.

To the extent we have not addressed any of the parties' remaining arguments it is because we have determined that they are without sufficient merit to warrant discussion in a written opinion. <u>See</u> <u>R.</u> 2:11-3(e)(1)(E). Vacated and remanded for a new trial consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0948-19